71 S.W.3d 452 (2002)
In the Interest of T.J.S., A Child.
No. 10-01-207-CV.
Court of Appeals of Texas, Waco.
February 6, 2002.
Rehearing Overruled March 13, 2002.
*453 Sidney Palmer Childress, Austin, for appellant.
J. Dwight Carmichael, McGregor, McGregor & Carmichael, P.C., Hillsboro, Stephen Keathley, Corsicana, for appellees.
Gregg Hill, Sims, Moore, Hill & Gannon, L.L.P., Hillsboro, attorney for T.J.S.
Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

OPINION
TOM GRAY, Justice.
Michael Don Sherrill appeals the trial court's Final Judgment regarding conservatorship and possession of his biological child, T.J.S. A jury determined that two non-parents should be appointed joint managing conservators of the child and appointed Sherrill possessory conservator. The court also deviated from the guidelines *454 of the Standard Possession Order as provided by the Texas Family Code in setting Sherrill's periods of possession and access to the child. Sherrill raises three issues on appeal:
1) The trial court had no discretion to appoint Sherrill possessory conservator rather than a joint managing conservator;
2) The trial court abused its discretion in refusing to enter the Standard Possession Order; and
3) The trial court abused its discretion in entering a possession order that varied from the Standard Possession Order.
We affirm the judgment of the trial court.

BACKGROUND
Berkeley was a sophomore in high school when she conceived T.J.S. It is undisputed that Sherrill is the father. Before she gave birth, Berkeley contacted Buckner Adoption Agency and ultimately selected Gary and Tammy Benton as prospective adoptive parents for her child. On January 27, 2000, Buckner filed suit in Bexar County to terminate the parental rights of both parents to facilitate the child's adoption by the Bentons.
T.J.S. was born February 20, 2000, in Amarillo, Texas. Two days later, with Berkeley's consent, the Bentons took the child to their home in Hillsboro, Texas. About two weeks later, Berkeley signed an unrevoked Affidavit of Relinquishment of Parental Rights, which named the Bentons as managing conservators. The Bentons have remained the primary caretakers of T.J.S. since he was two days old.
One day after the Bentons had taken the child to their home, Sherrill filed his answer to the Buckner termination suit. He contested the termination of his parental rights. Buckner subsequently dismissed the suit and discontinued the adoption procedures. The Bentons then filed suit in Hill County to terminate the rights of both biological parents and to adopt the child, or, in the alternative, to become managing conservators of the child.
Conflicting evidence was presented during the course of the trial regarding the events before and after the birth of T.J.S. Berkeley testified that Sherrill abandoned her during her pregnancy. According to Berkeley, Sherrill did not accompany her to appointments with her doctor or to counseling sessions. He attended only one childbirth class. He also advised her that he would not be present during the birth if it would prevent him from participating in one of his high school wrestling tournaments. He provided no financial support and stopped accepting her phone calls. Berkeley testified that when she began to explore their options, Sherrill did offer several alternatives to adoption; however, he either proposed unworkable solutions or failed to further explore or implement any plans that might have been viable. Berkeley claimed that she kept Sherrill fully informed of her contacts with Buckner and the Bentons, offering him the chance to meet the Bentons on at least two occasions. According to Berkeley's testimony, Sherrill never refused to consider adoption, and he never informed her that he would take possession of the child. On several occasions, he indicated that he would "probably" go along with Berkeley's decision.
Even after the birth of the child, Berkeley claimed that Sherrill would not make a final decision. Sherrill left the hospital knowing that the child would be released the next day and that Berkeley was not prepared to take care of their son. Berkeley testified that she informed Sherrill that if he did not make a decision before their release, she would proceed with the adoption. When Sherrill failed to respond, Berkeley decided that it was in the best *455 interest of the child to allow the Bentons to take him to their home.
In his testimony, Sherrill acknowledged that: (1) with the exception of one childbirth class and one counseling session, he never accompanied Berkeley to any appointments or attempted to meet with the Bentons, (2) he never offered the Bentons money to compensate for past expenses or to provide for future support, and (3) he has never asked the Bentons to see the child[1] nor has he sent any gifts to the child.
Sherrill admitted that he may have sent "mixed signals" to Berkeley regarding his intentions. He also presented conflicting testimony at trial. He testified that he never told Berkeley that he personally wanted to raise the child without qualifications or reservations. However, he also testified that after spending Thanksgiving with his mother, he decided that he wanted to parent his child and told Berkeley this on several occasions. At another point in his testimony, he stated that he had made up his mind that it was in the best interest of the child to live with him when he was served with Buckner's termination lawsuit in January before the birth of the baby. He also claimed that he informed Berkeley of his feelings at that time. In relating what happened while visiting the baby in the hospital, Sherrill said that he may have indicated that he would go along with Berkeley's plans for adoption, but that he
he had said that he did not know what he was going to do and that he had said this because Berkeley would not tell him what her plans for the child were. Sherrill stated that he moved to Austin several months after the birth of the baby with the intent of gaining custody of T.J.S. At one point, Sherrill acknowledged that he had never provided a realistic alternative to adoption other than placing the child with his mother until either he or Berkeley was able to parent the child. He also stated that his mother would be the "mother figure" in the child's life and acknowledged that his mother had offered to adopt T.J.S. herself.
The charge to the jury presented five questions regarding the termination of parental rights, conservatorship of the child, and determination of the primary residence of the child. No objections to the charge appear in the record. The only requested instruction in the record was filed by the Bentons and was made a part of the charge. The jury answered that the parent-child relationship between the child and the mother, but not between the child and Sherrill, should be terminated. When asked in a broad form question who should be appointed joint managing conservators of the child, the jury wrote in the names of the Bentons, but not Sherrill. The jury also answered that the Bentons should determine the primary residence of the child and that Sherrill should be appointed possessory conservator. The judgment was rendered in accordance with the jury's answers to the charge.
The court ordered phased-in possession with some supervision prior to the child's third birthday, but did not adopt the terms of the Standard Possession Order when the child turned three. Sherrill did not request that the court specify the reasons for the variance from the Standard Possession Order. Sherrill did file a Motion for New Trial seeking "a decent possession *456 order," but he never obtained a hearing on this motion.

JOINT MANAGING CONSERVATORSHIP
Sherrill is not contesting the appointment of the Bentons as joint managing conservators or their right to establish the primary residence of the child. Instead, he claims that he must also be appointed a joint managing conservator along with the Bentons because (1) the court had no discretion to make Sherrill a possessory conservator without a finding pursuant to Texas Family Code section 153.373; and (2) the evidence is legally and factually insufficient to support any finding that Sherrill voluntarily relinquished the child to the Bentons for one year or more. The Bentons contend Sherrill did not preserve error with respect to his right as a parent to be appointed joint managing conservator. We agree with the Bentons.
Parental presumption
Sherrill is correct in asserting that the Family Code provides a rebuttable presumption that a parent must be appointed either sole managing conservator or a joint managing conservator. Tex. Fam.Code Ann. § 153.131 (Vernon Supp. 2002). A parent must be appointed as sole managing conservator or both parents must be appointed joint managing conservators unless the evidence demonstrates that (1) it would not be in the best interest of the child for a parent to be a managing conservator because it would significantly impair the child's physical health or emotional development; or (2) the parent voluntarily surrendered the child for one year to the non-parent seeking custody, and the appointment of the non-parent is in the best interest of the child. Tex. Fam.Code Ann. §§ 153.131, 153.373 (Vernon 1996 & Supp.2002). In the second situation, the non-parent is put on equal footing with the parents; a best interest test then prevails. See Handbook of Texas Family Law § 15.10. However, unlike section 153.131, section 153.373 does not require a showing that the appointment of the parents would not be in the best interest of the child. R.S. v. B.J.J., 883 S.W.2d 711, 716, n. 6 (Tex.App.-Dallas 1994, no writ).
The jury charge
We agree with the Bentons' assertion that Sherrill's underlying complaint is with the charge. The instructions as presented to the jury regarding joint managing conservatorship read in relevant part:
In determining whether persons should be appointed joint managing conservators, you must find that such an appointment is in the best interest of the child. In making this determination, you shall consider all the following factors:
1. Whether the physical, psychological, or emotional needs and development of the child will benefit from the appointment of joint managing conservators;
2. The ability of the persons to give first priority to the welfare of the child and reach shared decisions in the child's best interest;
3. Whether each person can encourage and accept a positive relationship between the child and the other person;
4. Whether the persons participated in child-rearing before the filing of this suit;
5. The geographical proximity of the homes of the persons; and
6. Any other relevant factor.
The Texas Family Code provides that these factors are to be used to determine if appointment of parents as joint managing conservators is in the best interest of the child. See Tex. Fam.Code Ann. § 153.134 *457 (Vernon Supp.2002). However, the jury was limited in its possible choices of joint managing conservators only by the provision that a parent whose rights had been terminated could not be appointed, leaving it free to choose a non-parent as well as a parent.
The charge places the non-parents on an equal footing with the parent. As a result, the jury instructions did not require a finding of voluntary relinquishment by the parent before the jury could appoint a non-parent as managing conservator, as required by Tex. Fam.Code Ann. § 153.373 (Vernon 1996). Using the best interest test as outlined in the charge, the jury found that it was in the best interest of the child to appoint only the non-parents, the Bentons, joint managing conservators. Because there was no instruction regarding the parental presumption in the charge on appointing managing conservators, the jury was simply following the law in the charge given and resolving the issues presented when it refused to find that Sherrill should be appointed a joint managing conservator and appointed only the Bentons joint managing conservators.
Waiver
All parties are entitled to have controlling issues raised by pleadings and evidence submitted to the jury. Brown v. Goldstein, 685 S.W.2d 640, 641 (Tex.1985). A controlling issue is one that requires a factual determination to render judgment in the case. The issue must also be disputed. Collins v. Beste, 840 S.W.2d 788, 790 (Tex.App.-Fort Worth 1992, no writ). When the controlling issue is submitted, albeit in defective form, a question of waiver is involved if no objection is made to the jury charge. Allen v. American Nat'l Ins. Co., 380 S.W.2d 604, 609 (Tex.1964).[2] The Texas Rules of Civil Procedure provide that:
A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections.
TEX.R. CIV. P. 274. Just as in the case of objections to the charge, failure to present requested questions and instructions constitutes waiver of the right to do so. Wristen v. Kosel, 742 S.W.2d 868, 870 (Tex.App.-Eastland 1987, writ denied).
Application
This case presents one of the subtle differences between a case submitting the controlling issues in broad form questions versus the former disjunctive submission of issues. The controlling issues in this case are who will be appointed managing conservator, and if not appointed managing conservator, who will be appointed possessory conservator. These were the issues submitted to the jury. Because the controlling issues were submitted to the jury, any defect in the submission must be raised by an objection to the charge. Any problem with the issues in this case could have been resolved by proper instructions without changing the wording of the question. However, we find no objection to the charge as submitted or instructions requested by Sherrill in the record. This presents a situation where the charge submitted is the law by which the jury must decide the disputed issue. Thus we do not believe that this case involves a deemed *458 finding on an omitted issue. We find that Sherrill has waived the error, if any, in the trial court's failure to instruct the jury on the rebuttable parental presumption regarding appointment as managing conservator. In Interest of Baby Girl Rodriguez, 940 S.W.2d 265, 274 n. 2 (Tex.App.-San Antonio 1997, writ denied).
We must review the sufficiency of the evidence, in view of the charge given. Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000). Accordingly, it is unnecessary for us to decide the alternative argument that the issues presented to the jury regarding conservatorship are not the only issues that must be decided before the Bentons are appointed joint managing conservators and Sherrill appointed possessory conservator. If there were other issues that had to be decided before the trial court could render the judgment that it did, those issues are deemed found in favor of the judgment if there is evidence to support the deemed finding. In a sub-issue under the first issue, Sherrill attempts to challenge the legal and factual sufficiency of the evidence to support what, under this theory, may be a deemed finding-whether he relinquished control of the child. Because we have determined that the controlling issues were submitted to the jury and that Sherrill waived his complaint by failing to object to the charge as submitted, we do not reach this sub-issue.
Because Sherrill waived any complaint regarding the issue of appointing him managing rather then possessory conservator by failing to object to the charge, we overrule his first issue.

POSSESSION ORDER
In Sherrill's second and third issues, he argues that the trial court abused its discretion in refusing to provide him a Standard Possession Order effective when the child reaches three years of age and in entering an order that varies from the provisions of the Standard Visitation Order. The Bentons counter that the trial court is permitted to vary from the Standard Possession Order when, as in this case, the court determines that the standard order is unworkable or that it is in the best interest of the child to do so.
We give wide latitude to a trial court's determinations on possession and visitation issues, reversing the court's decision only if it appears that the court abused its discretion in light of the record as a whole. Gillespie v. Gillespie, 644 S.W.2d 449, 451 (Tex.1982). A trial court abuses its discretion when it acts arbitrarily or unreasonably, without reference to any guiding rules or principles. Worford v. Stamper, 801 S.W.2d 108, 109 (Tex. 1990).
The Family Code provides guidelines for trial judges to follow when determining the periods of possession for a possessory conservator. TEX. FAM.CODE ANN. § 153.192(b) (Vernon 1996). There is a rebuttable presumption that this Standard Possession Order provides a possessory conservator minimum possession of the child and that the order is in the best interest of the child. Tex. Fam.Code Ann. § 153.252 (Vernon 1996). The Family Code, however, allows the court to deviate from the Standard Possession Order. The court is allowed to consider (1) the age, developmental status, circumstances, needs, and best interest of the child; (2) the circumstances of the managing conservator and of the parent named possessory conservator; and (3) any other relevant factor. TEX. FAM. CODE ANN. § 153.256 (Vernon 1996).
On timely request, a trial court's order must state its specific reasons for varying from the Standard Possession Order. Tex. Fam.Code Ann. § 153.258 (Vernon 1996). Requiring a *459 court to state specific reasons for variance is functionally equivalent to making findings of fact. Accordingly, we apply the same standard of review when a party fails to request specific reasons for the variance under section 153.258 as when a party fails to make a request for findings of fact under Texas Rules of Civil Procedure 296 through 299. Jacobs v. Dobrei, 991 S.W.2d 462, 464 n. 2 (Tex.App.-Dallas 1999, no pet.). When a party does not request findings of fact, we infer that the trial court made all the necessary findings to support its judgment. Roberson v. Robinson, 768 S.W.2d 280, 281 (Tex.1989). We review the record to determine whether some evidence supports the judgment. Worford, 801 S.W.2d at 109. We consider only the evidence "most favorable" to the trial court's judgment and uphold that judgment on any legal theory that finds support in the evidence. Id.
In this case, both parties submitted proposed visitation plans for consideration by the court. The court adopted a variation of the Benton's plan, which deviated from the guidelines by limiting Sherrill's visitation to four twenty-four hour weekend periods per year after the child reaches his third birthday. The court also provided for holiday and birthday visitation, which, according to the trial court, incorporates several of the features of a standard possession order. In the Final Judgment, the court stated in relevant part:
After argument of counsel, including the stated position of the ad litem herein being duly considered, the Court is of the opinion that a standard possession order is not, under the facts of this case, in the best interest of the child. The Court ... after considering the unique working schedules of the joint managing conservators, the school/work schedule of the possessory conservator and his special circumstances of life, given his tender age (still in high school) and absence from the life of the child, in any practical or meaningful fashion, until this point in time, the Court finds the standard possession order of the Texas Family Code to be unworkable or inappropriate in this instance, and that the presumption that entry of a standard possession order is workable or appropriate has been overcome in this instance.
This statement indicates that the court considered the needs and best interest of the child as well as the circumstances of the conservators. Tex. Fam.Code Ann. § 153.256 (Vernon 1996). Because Sherrill did not request specific reasons for the variance, we will review the record to determine if the facts most favorable to the court's judgment support variance from the Standard Possession Order.
Needs and best interest of the child
At the hearing on Motion for Entry of Judgment, the ad litem, whose stated goal was to ensure that the child's life will be as normal as possible, advised the court that this "is not a standard possession case in my opinion, because it's not a standard case." The ad litem expressed concern over Sherrill's youth and inexperience in raising a child and over the fact that his primary helper in supervising the child would be his mother. The record reflects his mother's DWI charge, marijuana use, loss of custody of Sherrill and his brother, and failure to pay child support. Furthermore, the ad litem reminded the court that the jury intended for the child to be raised by the Bentons and that the Bentons expressed a willingness to include Sherrill in the life of the child. The Bentons testified that they had originally planned on an "open" adoption, in which both biological parents would be active participants in the life of the child. The ad litem recommended that the court adopt the plan submitted *460 by the Bentons because it was "put together with an eye towards normalization" of the child's life.
The court also cited Sherrill's absence from the child's life. The court heard testimony that Sherrill had not seen the child since birth, that he had not asked to see the child, and that the child knows only Gary Benton as his father. Testimony further established that Sherrill had provided no financial support nor gifts for his child.
Circumstances of the conservators
The court heard evidence regarding both Sherrill and the Bentons. Sherrill was eighteen years old and still in high school at the time of trial. He lived over a hundred miles away from the Bentons, with his mother and step-father and two other teenagers in a three-bedroom house. His schedule kept him away from home from 8:30 a.m. until 6:00 p.m. on weekdays and from 8:00 a.m. until 5:00 p.m. on Saturdays. Furthermore, Sherrill had made no effort to establish a working relationship with the Bentons for the sake of his son-never meeting with them before the birth of the child or requesting visitation afterwards. In fact, the record reveals that Sherrill has filed a million dollar lawsuit against the Bentons.
Both the Bentons work outside the home. However, the court heard testimony that both are active in the child's life, as are members of their extended family. The record also shows that Berkeley spends weekends at the Benton home as part of the open participation arrangement, in which the Bentons had planned to include Sherrill.
Other relevant factors
The court may have considered Sherrill's conduct during Berkeley's pregnancy. Berkeley testified that she presented Sherrill with a list of expenses in connection with the upcoming birth, but that Sherrill never provided support for Berkeley or the unborn child. In fact, he admittedly told Berkeley's mother that "nothing from nothing gets nothing" in reference to his inability to assist financially. However, Sherrill also testified that he paid $3,500 in cash for a car before he obtained his driver's license.
Furthermore, Sherrill's apparent dependence upon his mother may have caused the court concern. Sherrill testified that he was open to the idea of adoption until he met with his mother. Sherrill's mother testified that she informed Berkeley's family and Buckner's representative that the adoption would not happen. She refused to allow a home study to be completed. According to Sherrill's testimony, he never offered a viable option to adoption other than giving the child to his mother. Sherrill's commitment to parenting his child is called into question.
Summary
After reviewing the record, we conclude that the evidence most favorable to the judgment supports the court's variance from the Standard Possession Order. We find that the court followed the guidelines of the Family Code in determining visitation that is in the best interest of the child. Therefore, the court did not abuse its discretion either in rejecting the terms of the Standard Possession Order or in crafting a visitation order that deviated from it. We thus overrule Sherrill's second and third issues.

CONCLUSION
Having overruled all three of Sherrill's issues, we affirm the judgment of the trial court.
Justice BILL VANCE dissenting.
*461 BILL VANCE, Justice, dissenting.
Michael Don Sherrill presents a question of law: May a trial court refuse to appoint a natural parent of a child as a joint managing conservator in the absence of a finding that such appointment "would significantly impair the child's physical health or emotional development"? Tex. Fam.Code Ann. § 153.131(a) (Vernon Supp.2002). Because the majority fails to place the burden of obtaining a finding on the party with the burden of proof, I dissent to the section of the opinion entitled "Joint Managing Conservatorship."
The jury refused to find that Sherrill's parental rights should be terminated. Based on that, Sherrill, as the undisputed biological father, continues to enjoy a statutory presumption that he is entitled to be a managing conservator. Id. "[U]nder Chapter 153, the nonparent can rebut the parental presumption by showing that the appointment of the parent would significantly impair the child's health or development." See In re V.L.K., 24 S.W.3d 338, 341 (Tex.2000) (citing Brook v. Brook, 881 S.W.2d 297, 298 (Tex.1994)). Section 153.131 specifically provides that the presumption is overcome on a finding that appointment "would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development." Tex. Fam.Code Ann. § 153.131(a).
The charge submitted to the jury made no such inquiry, and the majority faults Sherrill for not objecting to the charge.[1] But Sherrill did not have the burden to establish his right to be a managing conservator; the Bentons had the burden of overcoming the presumption by obtaining the necessary finding under section 153.131. See id.; Brook, 881 S.W.2d at 298 ("Before a nonparent may be appointed as sole managing conservator or two nonparents as joint managing conservators, however, a higher standard must be satisfied, requiring proof that appointment of the parent or parents would significantly impair the child's health or development.") (quoting In re W.G.W., 812 S.W.2d 409, 413 (Tex.App.-Houston [1st Dist.] 1991, no writ) ("The party seeking to bar the natural parent from appointment as managing conservator[] .... must prove that the appointment of the parent ... would significantly impair the child's health or emotional development.")). Because the Bentons did not obtain such a finding, the court erred as a matter of law in failing to appoint Sherrill as a joint managing conservator.
It is now beyond dispute that a parent's interest in his child is of constitutional dimension. See In re R.G., 61 S.W.3d 661, 666 (Tex.App.-Waco 2001, no pet. h.). A parent enjoys a statutory presumption that he is entitled to be appointed a managing conservator. Tex. Fam.Code Ann. § 153.131. The effect of the majority's holding is to allow this parent's right-a right of constitutional dimension, a right recognized by a statutory presumption-to be procedurally forfeited. In that I cannot join.
In the Rodriguez case cited by the majority, the jury was specifically charged on the standard set forth in section 153.131.[2]In Interest of Rodriguez, 940 S.W.2d 265, *462 269 (Tex.App.-San Antonio 1997, writ denied). This is evident from the court's statement: "The jury was expressly instructed that they should name Mark [the natural father] as managing conservator unless they found that would not be in Madison's best interest because it would significantly impair her physical health or emotional development." Id. Even the footnote cited by the majority says: "[T]he evidence recited above is plainly sufficient to support the jury's finding that naming Mark as Madison's managing conservator would not be in her best interest because it would significantly impair her physical health or emotional development." Id. at 274 n. 2 (emphasis added). Here, the question asked of the jury does not address the section 153.131 standard. The reliance on Rodriguez is misplaced.[3]
The majority's discussion of section 153.373 of the Family Code is likewise misplaced. Tex. Fam.Code Ann. § 153.373 (Vernon 1996). Sherrill's citation of that section in his brief was merely to point out that no other provision of the Family Code could justify the trial court's failure to appoint him as a managing conservator. Whether he voluntarily relinquished his child to the Bentons for a year was never at issue in the trial court; no one ever asserted that he did.
A judgment appointing Sherrill and the Bentons as joint managing conservators is entirely consistent with the jury's verdict, which (1) refused to terminate Sherrill's parental rights; (2) terminated the natural mother's parental rights; (3) found that the Bentons should be appointed joint managing conservators; and (4) found that the Bentons should determine the child's primary residence. The fifth finding, that Sherrill should be appointed a possessory conservator, is immaterial in light of the statutory presumption and the failure of the Bentons to obtain the finding necessary to overcome that presumption.
I would reform the judgment to appoint Sherrill and the Bentons as joint managing conservators. Because the majority does otherwise, I respectfully dissent.
NOTES
[1] Although a temporary restraining order was entered about two weeks after the child's birth, Sherrill was not forbidden contact with the child. The record reflects that he was prohibited from disturbing the peace of the child and from changing the child's residence. This temporary restraining order expired by operation of law because an injunction was not subsequently granted.
[2] The Allen court distinguished this situation from one in which there is omission of a controlling issue. Instead of waiver, this second situation involves deemed findings: "it will be implied that the omitted issue was found in support of the judgment." Id.; see also TEX.R. CIV. P. 279.
[1] The specific question did not ask about Sherrill by name or identity. It merely asked the jury to fill in a blank line with the names of the persons it found should be named joint managing conservators.
[2] The Rodriguez court acknowledged: "[T]he burden is on the non-parent to initially produce evidence and make the showing required by section 153.131(a) by a preponderance of the evidence." In Interest of Rodriguez, 940 S.W.2d 265, 271 (Tex.App.-San Antonio 1997, writ denied).
[3] The finding is not sufficient under the statute, not to mention the "Lewelling standard," i.e., the requirement that the nonparent "identify some act or omission committed by [the parent] which demonstrates that naming [the parent] as managing conservator will significantly impair [the child's] physical health or emotional development." See In Interest of Rodriguez, 940 S.W.2d 265, 272 (Tex.App.-San Antonio 1997, writ denied) (citing Lewelling v. Lewelling, 796 S.W.2d 164, 168 (Tex. 1990)). The San Antonio Court rejects the Lewelling standard as part of the section 153.131 requirement. Id. at 272-73. The El Paso Court discussed Lewelling in In re De La Pena, an appeal from a bench-trial in which the trial court refused to disqualify the natural father in favor of his sister, who sought sole managing conservatorship. In re De La Pena, 999 S.W.2d 521, 528 (Tex.App.-El Paso 1999, no pet.).